In the Interest of Kathy Sue KELLEY,
a child.

Appeal of Michael D. KELLEY, father.

No. 60826.

Supreme Court of Iowa.

Feb. 22, 1978.

James R. Norris of Claassen, Kreuther, Ibeling & Wenzel, Cedar Rapids, for appellant.

Henry M. Keyes, Cedar Rapids, for Kathy Sue Kelley.

Richard C. Turner, Atty. Gen., Stephen C. Robinson, Sp. Asst. Atty. Gen. and Theodore R. Boecker, Asst. Atty. Gen., for appellee State of Iowa.

Considered by REYNOLDSON, Acting C. J., and LeGRAND, REES, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

This is an appeal by Michael Kelley from a decree terminating his relationship with his daughter Kathy Sue. The action was brought under chapter 600A, The Code. Michael contends the trial court erred (1) in failing to apply the clear and convincing evidence standard of proof, (2) in terminating the relationship on the ground of abandonment, (3) in terminating the relationship on the ground of nonpayment of child support, and (4) in terminating the relationship on the ground of failure to remedy conditions which led to a prior neglect adjudication. We affirm the trial court.

We have not previously said whether our review of termination proceedings under chapter 600A is de novo as it was when termination grounds were specified in chapter 232. See §§ 232.40–232.49, 232.58, The Code, 1975. The new statute incorporates by reference the hearing provisions of §§ 232.27, 232.28, 232.30, and 232.32. See § 600A.7(1), The Code. We believe that, by implication, we are to review termination decisions under chapter 600A in the same manner as we reviewed chapter 232 termination proceedings. Therefore our review here is de novo. Cf. *Long v. Long,* 255 N.W.2d 140, 143 (Iowa 1977); *In Interest of Wheeler,* 229 N.W.2d 241, 244–245 (Iowa 1975).

We recite the facts which we find established by clear and convincing proof upon our de novo review of the record.

Michael and Karen Meyers Kelley of Cedar Rapids had been married approximately four months when Kathy was born on July 26, 1974. Michael was then 17 and had been in the army stationed in Missouri for one month. Karen was 16. She had been the victim of child abuse and had been removed from her home by the juvenile court. Karen's county department of social services caseworker became Kathy's caseworker after she was born.

From the time Kathy was two weeks old Karen believed beating was an appropriate way to discipline her. Neither Karen nor Michael possessed even minimal parenting skills. Moreover, their marriage was unstable from its inception. Although they accepted counseling before their marriage, when they had to do so for Karen to get permission to marry, they rejected it thereafter. A public health nurse worked with Karen to little avail.

Michael obtained a discharge from the army in August 1974 on the ground of family hardship. He and Karen were plagued by financial problems and fought constantly.

In October 1974 Kathy received hospital care for a bruise which covered one side of her face. Michael told the investigating caseworker the baby had fallen out of her infant seat while he was babysitting and Karen was starting her first day on a job. The caseworker suspected child abuse.

Karen initiated a marriage dissolution action on October 25, 1974, and Michael left the home. They subsequently fought over possession of Kathy, and on October 29, 1974, the caseworker filed an affidavit to obtain emergency custody of the child, who as a result was placed in foster care. The caseworker testified the fighting, immaturity, financial difficulties and neglect made this action imperative.

The department of social services filed a petition alleging Kathy was a neglected child under § 232.2(15)(b), (c) and (d) of the 1973 Code. Following a hearing the juvenile court in December 1974 adjudicated Kathy to be a neglected child and ordered her kept in foster care. In February 1975,

pursuant to stipulation of counsel, the court placed Kathy in temporary custody of the department for "planning, casework and placement." She was to remain in foster care, subject to parental visitation rights, Karen was to continue counseling, and the matter was to be reviewed in six months.

Michael insisted Karen should not have Kathy and he believed she should either be placed for adoption or in his custody. The caseworker discussed this with him repeatedly. However, they met in person to discuss the subject only once. On 15 other occasions the caseworker tracked Michael down by telephone and attempted to explain what he had to do in order to assume parental responsibilities.

The caseworker suggested that they meet once a month, that Michael visit Kathy regularly so she would not forget him, that he get a job, that he find a place to live, that he obtain counseling, and that he pay child support as ordered or seek modification of the order.

Regarding one typical telephone contact she testified as follows:

Q. Did you go over with him the things he would need to do to get custody of the child? A. Yes.

Q. What were those things? A. Same things, counseling, regular visits, meeting with me, paying the child support, having a job and a place to live and—if he should get Kathy back—a willingness to continue with all that and to work with public health nursing, or whatever was needed.

Q. Now, did he indicate to you that he would follow through on that? A. Yes, he did.

Q. Did he follow through? A. He didn't follow through on anything.

Michael confirmed this testimony when he testified:

Q. Did you * * * take these steps at all? A. At first, I was thinking that maybe I should, but, no, I never did.

Q. Why? A. Because I didn't feel like it was right for somebody to tell somebody else * * * how to run their life.

He explained his failure to keep in touch with the caseworker as follows:

Q. Why was it that you didn't keep in touch with the department of social services? A. I felt like it was the department of social services job to keep the parents informed of what was going on, not the parents to keep them informed.

* * * * * *

Q. Do you feel it was their duty to come looking for you? A. Yes, that's what social services is suppose to be about, anyway, from what I understood.

In July 1975 Karen was permitted to visit with Kathy outside the foster home. Michael was upset by this. He expressed a desire to obtain custody of the child, but his interest lasted for approximately six weeks. He failed to follow the recommendations of the social services department and then made no contact with the department for approximately one year.

Michael and Karen's marriage was dissolved in October 1975. Michael was ordered to pay $110 a month toward Kathy's support, but from the time he left Karen until the time of trial of this case in April 1977 he actually paid nothing on his support obligation. Even though he claimed he could not afford to do so, he was employed most of the period involved and had quit one job to take a trip to Texas during that time.

Karen married David Youngbear and gave birth to a son in November 1975. In February 1976 Kathy was returned to her. Karen was to participate in Parent's Anonymous and receive counseling. In March David Youngbear went to prison.

Karen's care of Kathy steadily deteriorated. A new caseworker noted in August 1976 that Kathy's vocabulary was limited, she talked little and she seemed fearful. In early 1977 the social services department received reports of abuse of Kathy. Corrective counseling was attempted but failed. Finally, during the evening of March 21, 1977, Kathy was brought to a hospital emergency room. Karen had repeatedly and severely beaten her. She had large bruises on the head, arms and but-

tocks. Her injuries coupled with an iron deficiency caused her to be anemic. When she was released from the hospital eight days later she was placed in foster care where she has remained.

On April 1, 1977, a petition for termination of parental rights was filed by the social services department against Michael, Karen and David Youngbear. With respect to Michael the petition listed the following grounds for termination:

a) That the parents of said child have substantially, continuously or repeatedly refused or neglected to comply with the duties imposed upon these parents by the parent/child relationship, to wit:

1) That said parents have failed or refused to protect said child from physical injuries.

2) That said parents have failed or refused to provide a safe home to the extent that said child has suffered physical injuries which have required hospitalization.

3) That said parents have failed or refused to keep said child clean and in sanitary surroundings to the extent that her health was endangered.

4) That said failures and refusals have continued during the last half of 1976, and throughout January, February and March of 1977.

\* \* \* \* \* \*

c) That the Department of Social Services of Linn County has worked with the parents of said child as directed by the court to correct the conditions which brought about the adjudication of neglected child in this court on December 19, 1974. All such efforts by the Department have failed.

d) That the father of said child was ordered to pay $110 per month child support by this court on October 30, 1975, and has failed or refused to pay any part of said child support.

After trial, the court entered a decree terminating the relationship between Kathy and her natural parents and stepfather. The court held:

That the state has shown by clear and convincing evidence that the parents of said child have substantially, continuously and repeatedly refused or neglected to comply with the duties imposed upon them by such parent-child relationship; that the mother of the child is palpably unfit to continue in her parent-child relationship due to her consistent pattern of specific conduct detrimental to the physical and mental health of the child; that the parents, as directed by the court, have failed to correct the conditions which brought about the adjudication of neglect in December of 1974, that all efforts by the Linn County Department of Social Services have failed to remedy those conditions; that, further, the natural father, Michael Kelley, has abandoned the child and failed to pay support as ordered so as to meet substantially the requirement of his intent to permanently abandon the child.

Only Michael appealed.

I. *The standard of proof.* Michael alleges the trial court failed to apply the clear and convincing evidence standard of proof required by § 600A.8, The Code. However, the decree shows the court did so. In our de novo review we have applied the same standard. Cf. *In Interest of Hochmuth,* 251 N.W.2d 484, 489 (Iowa 1977).

II. *The abandonment ground.* Michael contends the court erred in terminating his relationship with Kathy on the ground of abandonment because that ground was not pled and he had no notice it was to be relied on. This contention has merit.

It is a denial of due process to adjudicate a termination of parental rights on a ground of which the parent has not had proper notice. *In re Meyer,* 204 N.W.2d 625 (Iowa 1973).

Here Michael was not notified termination would be sought on the abandonment ground. Therefore the trial court erred in terminating his parental rights on that basis. However, the court also terminated the relationship on three independent

grounds. If the evidence is sufficient to support termination on any of those grounds, it should be upheld. See *In Interest of Robbins,* 230 N.W.2d 489, 491 (Iowa 1975).

III. *Nonpayment of child support.* Michael asserts the court erred in terminating his parental relationship for nonpayment of child support. He argues this ground is not applicable because he was unable to pay the full amount of support ordered, Kathy was supported through ADC and thus was not harmed, and terminating the relationship solely for nonpayment of child support is unfairly punitive.

Although an amendment effective July 1, 1977, removed the last sentence of this provision, on the dates material here § 600A.8(7), The Code, authorized termination when

> [a] parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause. This subsection shall not be construed so as to state a ground for termination of parental rights of a noncustodial parent if that parent has not been ordered to or cannot financially contribute to the support of the child or aid in the child's birth.

Cf. Acts 67 G.A., ch. 140 § 25.

■ The record establishes without dispute that Michael was financially able to contribute some amount toward Kathy's support, but he voluntarily chose not to do so. Even though his earnings may have been insufficient at times to enable him to pay the full amount ordered, they were almost always sufficient to enable him to pay something. His antipathy for Karen and his willingness to let the public pay for Kathy's support do not constitute good cause for his failure to pay any part of the ordered support.

■ This ground of termination is not premised on a theory of punishment. Instead it makes abnegation of court-ordered financial responsibility to a child the equivalent of abandonment. A parent who unjustifiably refuses to meet a support obliga-

tion manifests complete indifference to his child. See *In Interest of Griffin,* 210 N.W.2d 665 (Iowa 1973). Michael's refusal was total and without good cause. In these circumstances we believe the evidence establishes this basis for termination.

IV. *Failure to cure the conditions which led to the adjudication of neglect.* The other ground of termination challenged by Michael is in § 600A.8(6), which provides for termination when

> * * * [f]ollowing an adjudication that the child is in need of assistance under chapter 232, reasonable efforts under the direction of the juvenile court have failed to correct the conditions giving rise to this adjudication.

Michael alleges he could not have been expected to correct the conditions leading to the December 1974 adjudication of neglect because he was the noncustodial parent. In doing so, he takes an unreasonably narrow view of this ground of termination.

Michael's wholesale failure to comply with any of the recommendations of the department of social services demonstrates he was unwilling to make any changes in his life which would make him a fit parent. He shared responsibility with Karen for the adjudication of neglect, and he shared responsibility for eliminating the conditions which caused it. Karen failed despite attempts to overcome her parental deficiencies. Michael did not even try.

■ In challenging the sufficiency of evidence to prove this ground, Michael asserts the court erred in overruling his objection to all evidence relating to his conduct prior to the middle of 1976. He relies on the allegation of the termination petition that his failures of parental duty "have continued during the last half of 1976, and throughout January, February and March 1977," arguing this allegation limits the evidence to that period. This assertion is without merit. The petition plainly puts in issue the entire history of Michael's relationship with Kathy. The quoted allegation enlarges rather than limits the State's claim.

The trial court did not err in overruling Michael's objection. Nor did the court err in terminating his relationship with Kathy on the ground of his failure to correct the conditions leading to the 1974 adjudication of neglect.

This case does not present the problem involved in *In Interest of Crooks,* Iowa, 262 N.W.2d 786, filed separately this date. Michael does not contend the department of social services was not acting under the direction of the juvenile court within the meaning of § 600A.8(6) in advising him of steps to take in order to cure the conditions which led to the neglect adjudication. In fact, the record shows the court ordered the department's casework and required quarterly progress reports. In this situation, Michael did not rehabilitate himself as a parent despite "reasonable efforts" by the department "under the direction of the juvenile court."

We do not address the sufficiency of evidence to support the remaining basis of termination which rested on § 600A.8(4), The Code, because Michael does not challenge it. As to this ground, see *In Interest of Robbins,* 230 N.W.2d 489 (Iowa 1975); *In Interest of Kester,* 228 N.W.2d 107 (Iowa 1975).

Paraphrasing what we said in *In re Scarlett,* 231 N.W.2d 8, 12 (Iowa 1975), we believe the conclusion is inescapable that the trial court was correct in terminating the parent-child relationship between Michael and Kathy. Someday, perhaps, Michael may mature into a well-adjusted stable person who will be a good parent. But Kathy is already three, and her needs must be met now. She cannot wait for her father to grow up.

We find no reversible error.

AFFIRMED.