GRACE SWEAT, Appellee, v. CLARENCE SWEAT, Appellant.

No. 47017.

OCTOBER 14, 1947.

A. E. Sheridan, of Waukon, for appellant.

Hart & Hart, of Waukon, for appellee.

BLISS, J.—Plaintiff filed her petition February 26, 1946, alleging the marriage of the parties in Clayton County, Iowa, in the year 1940; their residence in Allamakee County, Iowa, thereafter; the birth of their two daughters; her dutiful conduct

as a wife; his inhuman treatment, without just cause, endangering her life; his commission of adultery; and his refusal to live with plaintiff and their children. She filed an amendment to her petition on April 6, 1946, to comply with an order of the court, in which she alleged that defendant's inhuman treatment consisted in his refusal to live with her and the children; refusal to make a home and support them; admissions by defendant to her of his association with other women; his open flaunting of such association in public· and to. plaintiff; indifference to her and cruel words spoken to her in anger. She charged adultery with certain women, naming them, one of whom he went with openly from the spring of 1941 until he entered the Army in November 1942. She made similar charges against another woman in Winneshiek county when he was home on a furlough in February 1945, and after his discharge from the Army, and with whom correspondence by letters was carried on while he was away in the service up to as late as November 24, 1945.

Defendant, by answer and cross-petition, admitted the allegations respecting residence, marriage, birth of the children, and his refusal to live with her after his discharge from the Army about January 11, 1946. Other allegations were denied. In his cross-petition defendant alleged that he had given his wife no cause for complaint, but that without just cause she "has been guilty of cruel and inhuman treatment so as to endanger the life of the defendant and defendant is no longer able to live with the plaintiff." He charged that she left him without cause in December 1943, and absented herself from defendant for a period of over two years last past. He alleged that he was entitled to an absolute and unconditional decree of divorce and the care and custody of his two minor children. He prayed for such relief and for general equitable relief and for disbursements and costs. The allegations, other than the marriage and the birth of the children, were denied in plaintiff's reply.

The record fairly establishes the facts hereinafter noted: The trial was begun on September 5, 1946. At that time she was twenty-six years old and his age was twenty-five years.

Both parties were reared in Allamakee county. She was born on a farm, attended country school, and was graduated from the Waukon High School in 1937 at the age of nineteen years. She taught school for three years—two years before marriage and one year afterward. They lived in the home of his parents after the marriage. He did not wish her to go to the hospital to be confined but arranged for her to go to the home of his aunt, living near Postville, who had some neighborhood experience as a midwife. She went there a few weeks before her confinement. A baby girl was born October 26, 1940. She remained with the aunt until after Christmas, 1940, when the baby was two and a half months old. She then went to Lansing to take care of her mother. He never lived with her at the aunt's home, and she testified that he never came there to see either her or the baby after its birth. He said he was there the day the baby was born and the day before. While she was at her parents' home in Lansing her husband was teaching school about eight miles away. He testified:

"I knew my wife was in Lansing. Sometimes I was in Lansing a couple of times a week. I was in Waukon sometimes too. I never got around to see my wife and child. Road is paved between Waukon and Lansing. * * * Didn't get a chance to go down to my aunt's place to see the child. I don't remember when the last time was that I saw the child. Didn't see the child from the time it was born until the spring of 1941. Saw it then at John Webers. I stopped there and my wife brought the child out."

She traveled eight miles out there and back to let him see their child.

Plaintiff secured a room for herself and baby. Lived there about two months and a half. Thereafter she worked at different places—in a factory, and in homes. She paid others to care for the baby while she worked. In the fall of 1941 she began teaching school and taught until May 1942. Her mother kept the baby. During all this time, while she had a room, and while she worked at various places, and while she taught school, her husband never came to see her or the baby. After her school was out she kept books in a garage until July and then worked in a

factory until in November 1942. At no time during the periods above mentioned did the defendant talk to her or see her or the baby. Asked if her husband had seen the baby from the time it was born until he went into the Army in November 1942, she answered:

"Just before the day he left he was down and he saw her through the window of the train, I guess. I brought the baby to the Waukon depot. So far as I know appellant lived in Allamakee County from the time of our marriage until he went into the army."

If he saw the baby the day she was born he saw her but four times in two years and more, viewing the testimony most favorably for him. And when she came from Lansing to Waukon he was content to view them through the closed window of the coach. When she testified to this, and could proceed no further, the court had a recess and suggested she have a drink of water and a little fresh air. Her reply was: "I'll be better in a minute." He denied none of the testimony.

He was stationed at Miami Beach, Florida, during his first six weeks in service. She followed him to Miami. She stayed there a week, and saw him a few evenings, but they did not live together as man and wife. She returned to Allamakee county and stayed at home until January 1943, when she was employed at Ames, Iowa, until May 9, 1943. From the time the baby was born until he went to the Army he contributed to the support of herself and baby but $9—$7 at one time and $2 at another. Beginning February 1, 1943, she received her government allotment of $62 a month. After she quit work in May she went to Tampa, Florida, to be with him. She arrived there May 21, 1943. They had a small apartment and he was home almost every night. She was very happy. She was employed at the camp post exchange. In December 1943 she became pregnant and sick and was forced to give up her work. During the last week she was at Tampa he began remaining away at night. He was drinking and had the odor of liquor about him. She complained and he said: "If I want to go out and drink, I'll do it." He told her that he was going into operational training

and sent all his clothes and things back to the post. She told him she was sick and he was drinking, and, since he was being transferred into operational training, she was going home. When she paid $42 of her own money for her railroad fare home she had but $2 left. She asked him for some and he gave her $3. He admits that she told him to keep it if he needed it but he refused to take it back. She had $5 for expenses on a three-day trip. She did not know where he was stationed at all times after she left Tampa. She stayed with her parents after she returned to Allamakee county. She had not told him of her pregnancy when she left, but he had a furlough in January 1944, of eight days, exclusive of travel time. She said he spent twenty minutes at her home, at which time she told him of her pregnancy and he spoke angrily to her because of it. She asked him if he wished to see their child and he said no. He did not tell her where he was going and showed no affection for her. He brought no presents for her or the child. He testified that he spent more than twenty minutes with his wife. He said he spent two hours with his wife and child. He had no answer when asked if that was all he could spare them out of eight days, but he admitted that he had time to go to Winneshiek county to visit a lady friend, who was sort of a "pen pal" to him while he was in the service—who said in one letter:

"Honey, I wonder if you'll be moving this way soon, I sure hope so before you get this letter. It's been a long, long time, honey no loving no nothing. I guess you'll have to teach me all over again. Do you think you can? * * * ALL My Love and Kisses. Yours always and forever."

Plaintiff's second baby, a girl, was born August 10, 1944. A few letters passed between them after the birth of this baby.

The first monthly allotment checks from the government were $62. These continued for several months and were then increased to $80, and when the last baby came the allotment was $100 a month. The last government check came in February 1946. Out of these payments she had saved about $700 while living with her parents. Defendant was discharged from the service and returned to Allamakee county on January 10, 1946. He did not see his wife or children until in the fore part of

February following, about a month after his return. She testified that at this time:

"I * * * asked him to come back and live with me. He said, 'no'. I think I have asked him this every time I talked with him. I told him I had to have some help. He said he had his own board and room to pay. That is what he said this morning. I had a conversation with him * * * before the trial started."

She had a three-room apartment in Lansing at the time. Her rent, groceries, milk, and clothing for herself and children amounted to about $100 a month. She paid $35 down on a washing machine and did washing for a time. She had about $700 saved in February 1946 and had used it all for living expenses but $3 and a $25 government bond at the time of the trial. Since his discharge from the Army he gave her but $38. In the months of May, June, July, and August he received in wages, after all deductions, $650. He had steady employment with a construction company.

Repeatedly, by letter and personal request, she implored him to return to her. His answer was always a refusal and that he did not want her. He testified:

"My wife asked me in a letter to come back after I was out of the army. She came to see me at the hotel and we went out in the car and she asked me to come back. I refused. I said to her that we had tried it twice and she left both times. The one time she left was the time I have just explained at Tampa. The other time was when we lived down at New Albin. She pulled out about a month and a half before the baby was born. The two times she left was when she left to go and have her child and the other time was down in Tampa."

Those are the only complaints he makes against the plaintiff and neither has any reasonable basis. He gave her $3 when he had someone else take her away to have the first baby, in October 1940, and between that time and November 1942 he never lived with nor supported her and the baby. From her own wages and her government allotment while she lived with him for seven months in Tampa she had but $44 to take her

back to Waukon, and again he gave her $3. He never lived with her after December 1943.

He came to her apartment but few times after his return from the Army and always to ask for a divorce. In spite of this, during that summer she wrote him letters expressing the utmost love and devotion, without a word of criticism. An excerpt from one letter:

"I'm not asking you to come this time—so now feel better. Not that I don't want you to. I'd be so glad if you would. * * *

After this is all over I'll still love you always no matter what you say. My conscience is clear and you too know I've always been true to you * * *. I don't understand myself why I still feel this way about you. The agony of each day is almost more than I can bear. I get so lonesome to see you, [to] hear you say some kind things and laugh and to feel your face and hair oh just to show you how I care."

And just before the trial she wrote:

"Dearest Bus, I am going to ask you to do something, Bus. Tomorrow I'm going home to do some sewing for Janet and Connie. I want to ask you if you would, please, come down once again on Sunday. * * *

I'd like to ask you to come down for dinner with us—would you please? The kids and I go to church but we get home by 11:30 so you could come about then. We'll do everything we can to make it a happy day. Wouldn't you please plan on it. Let us be first with you for this time. It would mean so much to me. Please will you do this? I suppose you won't and then if you don't I guess I'll be seeing you at the court house next week—and I won't have had the chance to talk to you. Please, darling, do come. Janet asked me—'why don't my daddy want to live with us like other daddies?' "

They met at the courthouse the next week.

Even on about the last day of the trial, when she was so nervous and unstrung with mental anguish that she could hardly testify and was near fainting a number of times, the following examination shows her hopeless desire for the defendant:

"Mr. Sheridan: Q. If he continued to act as you have testified the last three or four days you were together in Florida, you wouldn't want to live with him, would you?" After continued silence on her part, and quiet urging by court and counsel, she answered: "If I knew I could believe him and trust him I would overlook lots of things. * * * Q. Mrs. Sweat, if he continued to do as you say he did the last three or four days you were in Florida, you wouldn't want to live with him, would you? * * * A. Yes, I would.' Q. You would still want to live with him? A. Yes. Q. Do you still want to live with him today? A. Yes, I do. I feel I can live with him without endangering my health, if he discontinues going out with others, I have always wanted to live with him. * * * Q. Now when did you make up your mind, that your husband wouldn't come back to live with you? A. After today."

Plaintiff offered no evidence of adultery on the part of her husband. But she proved that before he went into the service and after his return he was openly keeping company with several women, caressing them openly on the street, riding about with them, drinking beer with them in taverns, and dating with them for dances, movies, etc. Plaintiff saw him on some of these occasions. One of these girls testified to keeping company with him and drinking beer with him in a tavern. Another also testified for plaintiff and admitted keeping company with defendant and corresponding with him while he was in the service and dating him on his furloughs and after his discharge. Three of her amorous letters to the defendant overseas, dated November 12, 18, 22, 1945, were returned to the Lansing post office because of defendant's departure for home. The postmaster gave them to little Janet and she brought them to her mother. Each of the correspondents admitted the letter writing. That he was a busy penman is indicated by these lines in the letter of November 18th: "I can't ever keep up to you in letter writing anyhow, but will do the best I can, I'm sure glad you write every day, its wonderful, honey."

Defendant urges five propositions for reversal:

1. Separate maintenance cannot be granted on the ground

of inhuman treatment endangering life unless the evidence would justify a decree of divorce on that ground.

2. The court erred in granting separate maintenance.

3. The award of $80 a month for support, and attorney's fees and costs was an unwarranted abuse of judicial discretion and a grossly excessive award.

4. The court erred in dismissing defendant's cross-petition.

5. The court erred in making defendant's right to visit his children dependent upon his timely payment of the support money.

I. We will consider the first three propositions together. ▆▆▆ It is true that when separate maintenance is asked on the ground of inhuman treatment endangering life the standard and degree of proof required are the same as if a divorce were being asked on the same ground. Naumann v. Naumann, 182 Iowa 420, 165 N. W. 996; Krotz v. Krotz, 209 Iowa 433, 434, 228 N. W. 30; Shors v. Shors, 133 Iowa 22, 23, 110 N. W. 16; Leonard v. Leonard, 174 Iowa 734, 735, 156 N. W. 803.

▆▆▆ But in this case the evidence fully meets that test. Under the record plaintiff would be entitled to a divorce, on the ground of inhuman treatment endangering her life, were she asking for it. This mistreatment continued through much of the married life of the parties. It is true that he never inflicted physical violence upon her. But the mental whipping, the heartaches, the persistent worry from his neglect and indifference to her and the babies, his brazen relations with other women, to one of her gentle disposition and sensibilities certainly took a heavy toll from her health, her physical and mental well-being, and from her very life. One ordinarily soon recovers from a blow, but it is impossible to estimate the damage to body and mind from the never-ending hurts which he inflicted upon her. The words of Justice Deemer, in Craig v. Craig, 129 Iowa 192, 194, 195, 105 N. W. 446, 447, 2 L. R. A., N. S., 669, are appropriate in this case:

"Such wounds are deeper and more dangerous to health than blows, more harassing than profane language, and more distressing than vulgar talk. To trusting and sensitive women they are more brutal than bodily injury, and leave scars which

never can be healed. That it justifies a divorce is too clear for argument or the citation of authority."

We have many times held that life may be endangered by treatment though it involves no physical violence. Schneckloth v. Schneckloth, 209 Iowa 496, 497, 228 N. W. 290; Wallace v. Wallace, 212 Iowa 190, 192, 235 N. W. 728; Brookins v. Brookins, 230 Iowa 1272, 1275, 1276, 300 N. W. 540; Lewis v. Lewis, 235 Iowa 693, 699, 17 N. W. 2d 407; Littleton v. Littleton, 233 Iowa 1020, 10 N. W. 2d 57; Schnor v. Schnor, 235 Iowa 720, 722, 723, 17 N. W. 2d 375, 157 A. L. R. 628.

The award for the maintenance of plaintiff and the two minor children was neither excessive nor an abuse of judicial discretion. Plaintiff has no property of any consequence. The meager furnishings of her home would probably not sell for $100. Opportunity to earn money of any consequence for some time to come will be prevented by the care of the children. The older one is now in school and the younger one is just past three years old. A year ago she estimated her living expenses at close to $100 a month. They are higher now and will probably continue so. The award of $80 a month is fair and just. The award of $125 for her attorney is far from excessive. The defendant is earning good wages and there will be sufficient left to provide for all of his reasonable needs. We have no disposition to disturb the awards.

II. It needs no further comment on the evidence to reach the conclusion that defendant was not entitled to a divorce or to the custody of the children. His cross-petition was rightly dismissed. It was wholly without basis.

III. The able trial court made defendant's right to visit the children dependent upon his timely compliance with payment of the support money. He has never indicated much desire in the past to see them. But no unnecessary barrier should be placed between him and the children. In Fitch v. Fitch, 207 Iowa 1193, 1196, 1197, 224 N. W. 503, there was a similar provision in the decree. We modified it by holding that the right of visitation should be allowed or denied according to what was best for the children. If good may come to them from proper association with the father the opportunity should not be denied

because the support-money provisions of the decree are not fully complied with. It is therefore ordered that this visitation condition be eliminated from the decree. In addition to the attorney's fees for plaintiff's attorneys already taxed the additional sum of $100 is awarded.

With this modification with respect to visitation, the decree is affirmed.—Modified and affirmed.

OLIVER, C. J., and HALE, GARFIELD, SMITH, MANTZ, MULRONEY, and HAYS, JJ., concur.