CAROLINE SULLIVAN, appellee, v. M. J. SULLIVAN, appellant.

## No. 48222.

(Reported in 56 N.W.2d 910)

Swisher & Swisher and Edward L. O'Connor, all of Iowa City, for appellant.

William J. Jackson and Edward F. Rate, both of Iowa City, for appellee.

Bliss, J.—Plaintiff, sixty-one, and defendant, sixty-four, were married in 1911, and shortly after they moved from a farm in Johnson County onto a farm in Cedar County, Iowa, belonging to defendant's father, which they operated for about twenty years and on which their seven children, one of whom is deceased, were born. Defendant inherited the farm but lost it by mortgage foreclosure. They lived in West Liberty for five years, where defendant worked in a sale barn. In 1935 they moved to Iowa City where he did janitor work at the University Quadrangle, and thereafter was employed in various laundries. At the time of the trial his weekly pay after deductions was $46, for services in a laundry. Plaintiff inherited about $4000 in 1947, and at the time of the trial had between $1500 and $2000. All of the children are married and have families, excepting Marie, thirty-seven, who lives in Cedar Rapids. Plaintiff states that the farm was lost just through hard luck. Defendant "went on WPA" and remained there for a considerable time before he began the laundry work. The defendant is in good health and has been working regularly.

The trial was begun March 27, 1952. Defendant was not a witness and no one testified for him. Making a living became more difficult for them after they lost the farm in 1930. But there were no serious disturbances in their family life until about two years before the trial. Plaintiff testified:

"There has been a lot of change in him in his attitude toward me in the past two years. Within the last two years he has acted so much different than he usually did. Prior to that we were like everybody, we had arguments every once in a while, but we would make up and get along all right. During the past two years he just didn't want to have anything to do with me. He didn't want me to go any place with him, and he wouldn't have anything to do with me at home, and the last year he wouldn't even talk to me around the house. He would come home and if I would say anything to him he would not answer me or if he did he would tell me to keep still. He didn't want to hear what I had to say. That was his continuous attitude during the last year. During meals he wouldn't talk at all. He spent most of his time away from home in the evenings. When I would ask him where he was going he would say down town or it was none of my business. I would ask him why he was dressing up and going out so much, and he said he was leading his own life and I could live mine whatever way I wanted to, and it was none of my business what he did or where he went."

He had been giving her $35 a week before to pay the rent of $38 a month and all family expenses, but later he kept reducing the amount, and one week kept it all. She learned from her children and others that he was associating with another woman, taking her to dances, promenading on the streets with her, sometimes with his arm around her, waiting for and keeping appointments with her. When she first accused him of this association he grew very angry and denied it, and their quarrels were frequent. During the last year he would lose his temper and strike and kick her, leaving bruises on her body and limbs; one kick on her hip crippled her for about two weeks. These physical attacks occurred a half a dozen times during the last year. When she tried to reason with him he became very angry and abusive and she became afraid of him because she "never knew what he was going to do." She testified: "I had to beg for money. He wouldn't give it to me without asking for it, and when I would ask for it he would say, 'You may be doing with less money than that', or 'Get out and make your own living, for I won't be around much longer.' "

There was corroboration for much of this testimony. No one testified to his physical abuse of her, but the children saw bruises and black-and-blue marks on her body and limbs and observed his morose and sullen attitude toward her.

A doctor testified to treating and taping one of her ribs for a period of time, which injury defendant caused by angrily striking her with his elbow. A young man, later a son-in-law, who was courting a daughter at the home, heard her outcry and defendant's angry words at the time.

Later he flaunted his affairs with other women to her. After returning home at night, and she had gone to bed, the following were some of his greetings: "Well, I was out with a woman tonight. She was really good, she was better than you ever pretended to be." And the next time he told her he had a new one that night, and "she was really good." He was profane in his remarks to her and called her vile names which the witness "couldn't repeat." She further testified: "He has been gone since the 20th day of October, 1951. That was on Saturday evening and I went to a show and everything seemed to be all right when I left. I didn't see anything different than it had been and when I came home and went to hang up my coat, I saw his clothes were gone that had been hanging in the closet. * * * He has never been back since. He has never called me up. He has never talked to me. He hasn't paid a cent toward my support since he left in October."

John Sullivan, a son of the parties, Mrs. William Zenishek and Mrs. Herman Parrott, daughters of the parties, and William Zenishek, a son-in-law, testified for plaintiff.

Because of defendant's mistreatment of plaintiff the testimony is that she became highly distraught, her nerves were on edge, she could sleep but little, would awaken with a start from thinking about his conduct and his taunting remarks, his constant unsociability at home and frequent angry quarrels, his nightly association with other women, combined to make a nervous wreck of her. She lost weight. Her blood pressure became very high and her digestion troubled her. As she said: "It about finished me."

The court rendered a decree granting separate maintenance and support from the defendant, and awarding recovery for her

against the defendant a total sum of $300 for separate maintenance and support from January 7, 1952 to May 26, 1952, payable at the rate of $15 a week, and commencing June 2, 1952, and each and every week thereafter the sum of $17.50 payable into the office of the clerk of the court. The court also awarded her judgment against the defendant of $175 for her attorney fees for services in the trial court, together with all other court costs. .

When plaintiff rested at the close of the testimony for her on March 27, 1952, and the defendant offered no testimony, the court said:

"I doubt if there is corroboration in the record of physical assaults upon the plaintiff. * * * There is undenied corroboration of some very reprehensible—very reprehensible—conduct on the part of this defendant * * *. Whether or not under the entire record there is corroboration and the court can grant separate maintenance, I am not now deciding. I will decide it as soon as I can, and the case is submitted."

The remarks of the court were dictated to the court reporter in open court. There was no formal order, or other entry, of final submission. Court was adjourned March 27, 1952, at 4 p.m. On March 31, 1952, plaintiff filed application for leave to take additional testimony, alleging as grounds therefor that material testimony had been found that was not discovered and could not have been discovered by the exercise of reasonable diligence before the hearing, and that in furtherance of justice and in order to obtain a full and final hearing the cause should be reopened and the additional evidence submitted. Defendant filed resistance to the application and the matter was heard. The witnesses were present, and plaintiff's counsel dictated into the record, as an amendment to the application, that there were some matters that were overlooked by plaintiff's witnesses when on the stand and would be brought out in this re-examination. The court ruled that the circumstances were such that the reopening should be granted in the furtherance of justice, and that to deny it would be an abuse of discretion. The court so ordered.

A doctor, who by agreement was not previously called because what he would testify was conceded by agreement, took the stand and testified to the rib injury of plaintiff from his office records, and that he had made six calls upon her. He also testified that he had recently examined her for insurance and that she was ineligible because of high blood pressure.

Herman Parrott, a son-in-law of the parties, testified that he had seen defendant in the company of a woman, other than plaintiff, at least ten times in a four-month period, at both daytime and late night, in the late summer and fall of 1951. He testified that he had not reported these matters to the plaintiff after her husband had left her.

██ I. Defendant urges on this appeal that the court erred in rendering the decree because there was insufficient evidence to establish the ground of divorce alleged. We find no merit in this contention. There was evidence of physical abuse which though it did not seriously disable her put her in a state of constant fear of more serious injuries that he might inflict, and affected her mentally and physically. We have repeatedly held that cruel and inhuman treatment endangering life may be caused without physical abuse. The mental suffering which defendant inflicted and the consequent results upon her physically and upon her health were sufficient to endanger her life within the meaning of the statute. Hurts of the kind that defendant heaped upon plaintiff had as deadly a tendency, and perhaps more so, than physical hurts. We think the evidence was ample to sustain the court's finding and decree that the allegation of the petition had been sustained. See the following decisions and authorities therein cited: Lewis v. Lewis, 235 Iowa 693, 699, 700, 17 N.W.2d 407; Schnor v. Schnor, 235 Iowa 720, 722, 723, 17 N.W.2d 375, 157 A. L. R. 628; Brannen v. Brannen, 237 Iowa 188, 189, 190, 21 N.W.2d 459 (misconduct of husband with other women, even without adultery, is sufficient); Sweat v. Sweat, 238 Iowa 999, 1009, 29 N.W.2d 180; Low v. Low, 232 Iowa 1114, 1117, 7 N.W.2d 367. Many other cases could be cited.

██ II. There was ample corroboration to both the physical and nonphysical blows. Witnesses testified to the plaintiff's appearance, conduct, nervousness, and health. Corroboration may be direct or circumstantial, and it need not support the decree

844

or the testimony on all points. Low v. Low, 232 Iowa 1114, 1117, 1118, 7 N.W.2d 367; Courtney v. Courtney, 214 Iowa 721, 724, 725, 243 N.W. 510.

III. The findings of the trial court in cases of this kind should be given much weight. Dillavou v. Dillavou, 235 Iowa 634, 639, 17 N.W.2d 393; Robbins v. Robbins, 234 Iowa 650, 652, 12 N.W.2d 564; Neff v. Neff, 237 Iowa 69, 71, 20 N.W.2d 916.

IV. There was no error in reopening the case for additional testimony. It was in the interest of justice and within the discretion of the trial court, with which this court is always reluctant to interfere unless there is a clear showing of abuse. There was no such abuse. Allemang v. White, 230 Iowa 526, 533–536, 298 N.W. 658; Sickles v. Dallas Center Bank, 81 Iowa 408, 412, 46 N.W. 1089, 1090; Mealey v. Scott, 242 Iowa 787, 791–794, 48 N.W.2d 262; Eggspieller v. Nockles, 58 Iowa 649, 652, 653, 12 N.W. 708.

The judgment and decree is—Affirmed.

All JUSTICES concur except LARSON, J., not sitting.