Donald Michael KLOBNOCK, Appellee,

In the Interest of Cody Michael Abbott, a Minor,

Michael David ABBOTT, Appellant.

No. 64697.

Supreme Court of Iowa.

March 18, 1981.

Clark L. Holmes, Des Moines, for appellant.

Stephen P. Meyer and Mary M. Meyer, Chariton, for appellee.

James B. Mefferd, Jr., Chariton, guardian ad litem for the minor.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and McGIVERIN, JJ.

McGIVERIN, Justice.

The main question here is whether the parental rights of Michael David Abbott should have been terminated under section 600A.8(4), The Code 1979, for failure to support his natural child, Cody Michael Abbott. We affirm the trial court order terminating the father's parental rights.

Section 600A.8(4) provides in relevant part:

> The juvenile court shall base its findings and order under section 600A.9 on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights.
>
> . . . .
>
> 4. A parent has been ordered to contribute to the support of the child . . . and has failed to do so without good cause.

Michael appeals contending (1) that under the circumstances his parental rights should not have been terminated for failure to provide support, and (2) that section 600A.8(4) is unconstitutionally vague as applied to him.

I. *Facts and proceedings.* Our review of a trial court's finding of grounds for termination of parental rights under section 600A.8 is de novo. *In re Hoppe*, 289 N.W.2d 613, 614 (Iowa 1980); *In re Kelley*, 262 N.W.2d 781, 782 (Iowa 1978); Iowa R.App.P. 4. We give weight to the fact findings of the trial court, especially when considering the credibility of witnesses, but are not bound by them. Iowa R.App.P. 14(f)(7).

Our de novo review reveals that the following facts were established by clear and convincing evidence as required by section 600A.8. Cody was born July 8, 1976, to the marriage of Michael and Connie Abbott.

That marriage was dissolved on September 19, 1977, and Connie was awarded custody of Cody. The decree ordered Michael to pay to Connie $100 per month support for their minor child until the child reached age eighteen, became self-supporting or had completed his education, whichever occurred first. He was to have reasonable visitation with the child.

Michael paid no child support during the first two years after the decree. He only saw his son once or twice during that time. Since the dissolution, he has lived in Des Moines and worked at the John Deere plant where his gross weekly pay averages $400. He admitted at trial he could have paid the ordered support but did not.

After the dissolution, Connie and the child lived in Chariton, Omaha and Indianola. On September 15, 1978, Connie married Donald Klobnock, the petitioner. They moved with the child to Chariton and still reside there. Donald has supported the child since Donald married Connie. He testified he loves Cody and wants to adopt him. Connie, of course, encourages that prospective adoption.

On August 6, 1979, as a prerequisite to adoption, section 600.3(2), The Code, Donald filed a petition under chapter 600A to terminate the parent-child relationship between Michael and Cody. Donald had standing to bring the termination action as a prospective parent and as stepparent-custodian of the child. §§ 600A.5(1), .2(6), .2(8).

The petition alleged that the natural father, Michael, had been ordered in the dissolution decree to pay child support but failed to do so without good cause. § 600A.8(4). A guardian ad litem was appointed for the child. § 600A.6(2).

At trial, on October 8, 1979, Michael resisted the termination. He admitted failing to pay support, despite an ability to pay, but claimed that he had not been allowed to visit the child. The evidence showed he telephoned Connie's parents a few times after the decree but, at her request, they did not tell him where she was living due to Michael's alleged history of violence to Connie and her property. Although he knew Connie's general location when she lived in Omaha and Chariton, he made no effort to contact her, obtain her telephone number, or see the child. Michael testified that he consulted two attorneys to enforce his visitation rights but was told he would have practical problems in court on that issue unless he paid his child support.[1] That advice seemed to curb his desire for visitation and he continued to pay no support.

The amount of delinquent support for the two-year period since the decree was $2400. Michael said at trial that he wanted to pay all the support. He admitted he had no real excuse for not paying it. He had $500 in a savings account and had been saving $50 per week from his paycheck at his credit union. The court granted him until October 22 to pay the delinquent support to the clerk of court. If so paid, the petition to terminate his parental rights would be dismissed. If the support was not paid, the petition would be granted.

Michael only paid $400 by October 22. On October 25 Donald filed an application for an order terminating Michael's parental rights. Michael filed a motion to dismiss the petition contending, *inter alia*, that chapter 600A, as applied to him, violated the due process and equal protection clauses of the United States and Iowa Constitutions when used to terminate parental rights because of failure to pay child support.

On December 26 the court made detailed findings of fact, conclusions of law and rendered a decree granting the petition and terminating the parent-child relationship between Michael and his son, Cody. Michael appeals from that order.

We turn now to the issues presented by Michael.

---

1. In the dissolution of marriage context, failure of a father to pay support should not deprive him of visitation rights with his child. *Green v. Sherman*, 173 N.W.2d 843, 847 (Iowa 1970); *Sweat v. Sweat*, 238 Iowa 999, 1009, 29 N.W.2d 180, 185 (1947).

**II.** *Termination for failure to provide support.* Michael says the evidence does not establish grounds for termination of his parental rights. Section 600A.8 lists six grounds which, if established by clear and convincing proof, "shall be, either separately or jointly, grounds for ordering termination of parental rights." The legislature's use of the word "shall" imposes a duty on the trial court to recognize these grounds for termination if they are established by the evidence. § 4.1(36), The Code. In this case, grounds for termination exist if "a parent has been ordered to contribute to the support of the child ... and has failed to do so without good cause." § 600A.8(4). *See Mullins v. Mullins,* 606 P.2d 573 (Okl. 1980) (willful failure to pay support as ordered in divorce decree a ground for termination); *Brazier v. Brazier,* 597 S.W.2d 442 (Tex.Civ.App. 1980) (failure to support when able to do so ground for termination).

The provision in section 600A.8(4) for termination of parental rights for failure to pay ordered support was added by the legislature in 1976. 1976 Session, 66th G.A., ch. 1229, § 8. This is our first opportunity to consider whether parental rights should be terminated solely for failure to pay child support.

A parent has a basic obligation to support a minor child. The legislature has determined that it is in the best interests of a child to terminate a parent-child relationship if the parent refuses to support the child. Although abandonment is a separate ground for termination, section 600A.8(3), we conclude that the legislature intended termination for nonsupport to occur where a parent's failure to pay manifests indifference to a child and is therefore akin to abandonment. "[A]bnegation of court-ordered financial responsibility to a child [is] the equivalent of abandonment. A parent who unjustifiably refuses to meet a support obligation manifests complete indifference to his child." *Kelley,* 262 N.W.2d at 785. A substantial, and not merely sporadic or insignificant, failure to pay ordered support without good cause justifies termination of

parental rights under section 600A.8(4). So interpreted, our statute is similar to other states' statutes allowing termination, or dispensing with a requirement of consent to adoption, for failure to support a child for a specific time period. *See, e.g., Pender v. McKee,* 266 Ark. 18, 582 S.W.2d 929 (1979) (failure to support for one year allows adoption without consent of nonsupporting parent); *Beverly v. Kennedy,* 153 Ga.App. 149, 264 S.E.2d 690 (1980) (statute since repealed); *In re Lockmondy,* 168 Ind.App. 563, 343 N.E.2d 793, 1 A.L.R.4th 825 (1976) (consent of noncustodial parent who fails to support child for one year not needed for adoption); *Mullins,* 606 P.2d at 574; *Craddock v. Worley,* 601 S.W.2d 445 (Tex.Civ. App. 1980).

We conclude that Michael has substantially failed to pay support as contemplated by section 600A.8(4). Clearly, Michael has failed to pay $100 per month child support, as ordered in the dissolution decree, for the first two years after the decree, including up to the day of trial. He finally paid $400 when given an extension by the court. We agree with the trial court that "the father was aware of his obligation to provide such support [and] that he failed to contribute appreciably to such support until the commencement of the present proceedings."

Once a court finds a failure to pay ordered support, the question is whether that failure was without good cause. § 600A.8(4). There is no question that Michael was financially able to meet his support obligation. He admitted at trial that it would not have been difficult to pay $100 a month.

Michael advances two reasons why he failed to pay the support. The first is that Connie would not allow him to visit the child. The dissolution decree granted Michael "unlimited visitation." Michael claimed that he tried, without success, to visit the child and therefore refused to pay support. We decline to find that this is good cause for failing to provide support. Michael's remedy if he felt that he was not being allowed to exercise his visitation rights is not to unilaterally withhold sup-

port payments. The testimony at trial revealed that relations between Michael and Connie are strained, particularly over the visitation issue. Michael's antipathy for Connie, however, is not good cause for failing to pay ordered support. *Kelley*, 262 N.W.2d at 785.

■ The second reason why Michael claims he failed to pay support is because he did not know whether to pay it to the clerk of court or directly to Connie. The decree ordered Michael to pay $100 per month to Connie. *Cf.* § 598.22 (requiring all orders of support to direct payment to clerk of court). While there may have been some question about where he was to pay the support, we cannot find that this is good cause for failing to pay for over two years.

■ Although the statute does not expressly require a separate consideration of the welfare of the child once statutory grounds for termination are established under section 600A.8(4), Michael also contends that termination would not benefit Cody. Section 600A.1 provides that the welfare of the child shall be the paramount consideration in interpreting chapter 600A. However, the record reveals that Michael showed little interest in his son prior to the termination trial. As stated above, Michael did not substantially contribute to the support of Cody for two years after the dissolution decree when he had the ability to do so. This evidence is consistent with the legislature's determination in section 600A.8(4) that a child's welfare is served when the parent-child relationship is severed for the parent's failure to pay ordered support without good cause. Donald, the stepfather, assumed the support of the child. The child now has a stable home with his mother and stepfather, who loves him and wishes to adopt and continue supporting him. We conclude that termination for Michael's failure to support Cody under these facts is in the best interests or welfare of the child.

We hold there was clear and convincing proof to justify termination of Michael's parental rights under section 600A.8(4).

■ III. *The constitutional issue.* Michael asserts on appeal that section 600A.8(4) is unconstitutionally vague as applied to him. He claims here that he was not given notice that termination could result from nonsupport. We decline to reach the merits on this issue because it was not properly presented to the trial court.

Michael raised the constitutional issue for the first time after trial in a written motion to dismiss. It stated that to deprive Michael under chapter 600A of his parental rights for failure to pay child support "is contrary to the due process and equal protection clauses of the United States and Iowa Constitutions." The record does not reflect that he further specified the constitutional attack. The trial court was not alerted to more precise grounds and overruled the motion.

■ The court was never presented with the vagueness argument or an attack specifically on section 600A.8(4) that Michael asserts here. We will not allow a party to make a general reference to constitutional provisions in the trial court and then seek to develop the argument here. *State v. Paulsen*, 293 N.W.2d 244, 247 (Iowa 1980); *Beitz v. Horak*, 271 N.W.2d 755, 759 (Iowa 1978); *State v. Washington*, 257 N.W.2d 890, 895 (Iowa 1977), *cert. denied*, 435 U.S. 1008, 98 S.Ct. 1881, 56 L.Ed.2d 390 (1978) (motion referring "to several constitutional provisions, each containing a number of safeguards, would [not] alert trial court to the question raised"); *Martin Brothers Box Co. v. Fritz*, 228 Iowa 482, 492, 292 N.W. 143, 148 (1940).

The trial court was right in terminating the natural father's parental rights under section 600A.8(4).

AFFIRMED.

All Justices concur except UHLENHOPP, J., who dissents.

UHLENHOPP, Justice (dissenting).

I. The facts regarding nonsupport by Michael, the father, are similar to those in numerous contempt proceedings brought to compel support. This case, however, con-

tains a vital difference: the objective is not to compel Michael to support his child but to end his parentage of Cody totally and permanently on account of his failure, without good cause, to pay support. That Michael did not pay in accordance with the dissolution decree, and that the nonpayment was without good cause in law, are undisputed facts.

Beyond this case lies an adoption proceeding by Cody's stepfather. Present section 600.3(2) of the statute on adoptions, requiring either consent of the present parent or termination of the parent-child relationship, changes the prior law. *See In re Adoption of Gustafson*, 240 N.W.2d 674, 676 (Iowa 1976).

Our statutes now permit termination of the parent-child relationship for nonsupport without good cause in section 600A.8(4), The Code 1979:

The juvenile court shall base its findings and order under section 600A.9 on clear and convincing proof. The following shall be, either separately or jointly, grounds for ordering termination of parental rights:

. . . .

4. A parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause.

In the application of such a statute, the conduct of parents upon which forfeiture of the parental relationship is asked may range from a slight violation of section 600A.8(4) to a very aggravated violation evincing complete rejection of parental interest and responsibility. In practice, cases of nonsupport cover the full spectrum. I do not believe the General Assembly intended that a person lays his or her parentage on the line if he or she ever fails to make a required payment without good cause in law. Such a rule would undermine parentage in countless cases. *See In re Griffin*, 210 N.W.2d 665, 667 (Iowa 1973) ("It is a fearful thing to terminate the relationship between a parent and child."). The practical and customary procedure in the nonsupport case, although not sought here, is to

bring the delinquent parent before the court, if necessary, on contempt charges. No doubt we all agree that courts are not to decree termination, robot-like, in every case where termination is asked and nonsupport without good cause appears, *irrespective of the circumstances.* I believe the General Assembly had the severe cases in mind, where the circumstances of the nonsupport persuade the tribunal that the parent has practically shrugged off the parent-child relationship. The care the General Assembly expressed for that relationship in the companion section in the Juvenile Code, section 232.116, demonstrates its solicitude for the relationship.

The question then is this: where does the present case fall in the spectrum? The record reveals the strife which frequently exists in marital breakup. Michael states he desired to visit the child during the two-year dissolution period, and he professes a desire to continue to do so. His father supports him in this, and both of his parents desire to visit the child. *See* § 598.35. Michael claims he tried unsuccessfully six or eight times, through calls to the parents of his former wife, Connie, to locate Connie and the child; Connie moved several times. Michael testified:

Q. Do you want to visit the child? A. Yes.

Q. How long have you wanted to visit the child? A. Ever since he was born.

Q. What efforts have you made to secure visitation? A. Everything I could think of. My hands were tied for a while. Nobody was giving me any cooperation.

Q. Are you willing to pay child support? A. Yes sir.

. . . .

Q. You love your child? A. Yes.

Q. Have you ever had an address of Connie so you could send the money there? A. Just her folks' address is all I ever knew.

Q. Do you want your relationship with your child terminated? A. No, sir.

Q. Do you want to maintain the relationship with the child? A. Yes.

Q. As he grows up? A. Yes.

On the other hand, Connie says she and her present husband were listed in the telephone directory, and Michael could have located her. She also testified, however:

Q. In fact, you don't want him to know where you are living, do you? A. No, not particularly.

. . . .

Q. You don't want him to visit the child, do you? A. In the best interests of Cody, no; I do not.

. . . .

Q. Your parents did not tell him where you were living at your request? A. Yes.

Connie also sought to show that Michael was violent, but this attempt appears to have ended in a draw. She testified:

A. He had a violent temper at times. I felt he was very irresponsible. During the separation he was free to come and see Cody any time, and most of the time he did he was violent and caused physical damage to not only my home I was living in but bodily damage to me.

Q. To you? A. Yes.

Q. Is it safe to say you were afraid of Mike Abbot? A. Yes.

Later this occurred on cross-examination:

Q. Let me ask you this. You were testifying to Mike's temper before you got divorced. A. Yes.

Q. At that time was he mad at you because you were using drugs?

Mr. Meyer [one of the attorneys of Cody's stepfather]: Objection. Irrelevant.

Mr. Holmes [Michael's attorney]: They went into it.

Mr. Meyer: No, we didn't, Your Honor.

The Court: I don't think you took any part in the examination of the witness.

Mr. Meyer: I believe I can object though, can I not?

The Court: Not ordinarily.

Mrs. Meyer [stepfather's co-counsel]: Would you like me to make the objection?

The Court: I believe I do.

Mrs. Meyer: I do object to this as totally irrelevant. I don't see what this has to do with it.

The Court: I don't want to get into that issue if I can avoid it.

Mr. Holmes: Can we call it a draw on the temper then?

The Court: Fairly well.

Michael testified on the issue of injury:

Q. Have you ever harmed the child? A. No, sir.

Q. Would you ever harm the child if visitation was set out for you? A. No, sir.

The real reason for the present proceeding appears to be the prospective adoption by the stepfather, to which Michael will not consent. See § 600.3(2). Connie testified:

Q. He didn't get visitation because he didn't pay the hundred dollars a month? A. No. Not at all. I never took him to court to get the money.

Q. You have never tried to get the money? A. No.

Q. The reason was you didn't want him to find out your address? A. That wasn't the reason.

Q. You just said it a minute ago. A. That wasn't the reason I didn't take him to court to get the money. So far as him paying the money, it didn't make any difference. It is in Cody's best interests that Mike Abbott didn't see him.

Q. We are in court today not because of the money; you don't think the money has anything to do with it, is that correct? A. Yes; I do. He has not supported the child. He has abandoned the child.

Q. Didn't you say it didn't make any difference to you? A. I said before I have not made any attempt to come to court to get $200 the first 2 or 3 or 4 or 5 months we were married. It has been 2 years. The boy is 3 years old. I am remarried. We have a family. It is now not just 3 or 4 months. It is 25 months.

. . . .

Q. The major reason, aside from the fact that you are not getting any child support that is ordered to be given to you, that you are bringing, or Mike [stepfather] is bringing this action is so that

you can—Mike can adopt Cody? A. Yes; that is exactly correct.

Looking at finances, Michael admitted that he could pay $100 monthly support. He grosses $400 weekly as a factory worker and has about $200 weekly net:

Q. You are telling me you only bring home 50 percent of your wage? A. Yes. 85 goes into my credit union, 50 into savings, 25 to a loan, 10 into paying to work.

Q. What is paid into the credit union? Is that a loan? A. Yes.

Q. What is the loan for? A. Rent.

Q. I don't understand how that works. A. I had a bad month one time. I was laid off 30 days without pay and I needed the rent so I borrowed the money.

Q. How much did you borrow? A. 250, 265.

Q. How much do you have in your savings account?

A. A little over $500.

Q. This is added to at $50 per week? A. Yes.

Q. Where is the savings account? A. With my credit union.

Q. Is that the John Deere credit union? A. Yes.

Q. There is $50 and $65. That has you down to about 290. I assume the rest goes for taxes? A. Yes. Union dues, things like that.

Q. In other words, it wouldn't have been very difficult for you to pay $100 a month? A. Not at all.

Q. Why did you refuse to pay? A. She wasn't letting me see him.

In answering questions by this court, Michael's attorney also candidly stated at the oral argument that he had "relieved" Michael of funds, undoubtedly as a payment on fees.

The record contains other evidence regarding the circumstances of the case, of the kind commonly found in contempt proceedings.

At the conclusion of the hearing the trial court summed up the case as follows:

The Court: The record in this matter shows that decree of dissolution was entered on September 19, 1977, it being DM No. 324, on the petition of Connie Lee Abbott and concerning Michael David Abbott.

The provisions of the decree entered in that case require Mr. Abbott to contribute to the support of his child, Cody Michael Abbott, at the rate of $100 per month, but the decree is silent with respect to the place and time that the monthly payments had to be made.

It appears satisfactorily from the record, so far as the Court is concerned, there hasn't been anything paid on the requirements as far as child support is concerned since the entry of the decree in September 1977. Apparently part of this disinclination or refusal to pay child support is attributed to difficulties over visitation, with which the Court is not particularly concerned in this cause of action.

I think in view of the record made here, there isn't clear and convincing evidence that the parental rights between Mr. Abbott and his child, Cody Michael Abbott, should be terminated.

Under these circumstances, the Court is going to make the following ruling. In the event the delinquent child support is paid to the Clerk of the District Court by October 22, 1979, the petition will be dismissed without prejudice at the petitioner's costs. If that child support, as required by the decree, has not been paid on or before October 22, 1979, the allegations of the petition will be considered sustained, his parental rights will be terminated and Connie Lee Klobnock will be appointed as guardian and custodian of the child, Cody Michael Abbott.

Michael did not raise $2400 within the fourteen-day period allowed by the court; he paid $400. The court set the proceeding for further hearing, and the parties entered into the following stipulation:

Come now the parties and stipulate that if called upon to testify, Michael David Abbott would testify as follows:

1. That on October 8, 1979, the Honorable A. V. Hass, Judge ordered Michael David Abbott to pay his delinquent child support in full on or before October 22, 1979. The sum amounted to approximately $2,400.00.

2. That in an effort to raise this sum, Michael David Abbott sought to borrow money from Cash Credit, Dial Finance, and Beneficial Finance Companies of Des Moines, Iowa, and was refused credit.

3. That he sought to borrow money from his parents and friends and was unable to do so.

4. That he managed to borrow $295 from the John Deere Credit Union and paid that sum together with $105 to the Court as child support.

5. That he has made an honest effort to comply with the Court order and has done so to the best of his ability.

After the second hearing, the court terminated Michael's parentage of Cody. The court stated in its conclusions:

If an able parent opts to ignore his support obligation, there is no constitutional reason why his parental rights should not be severed. The Court finds that the Petitioner is Cody's stepparent, that the evidence is clear and convincing that Michael David Abbott was ordered to contribute to the support of his son, Cody Michael Abbott, at the rate of $100 monthly when the marriage of Cody's parents was dissolved on September 19, 1977, that the father was aware of his obligation to provide such support, that he failed to contribute appreciably to such support until the commencement of the present proceeding, that such failure was without good cause, that the father was afforded an opportunity to eliminate the deficiency in support payments, that he failed to do so and that he has made no representation that he will perform in the future as required by the decree of dissolution. His failure without good cause to support his child is the equivalent of abandonment. *In the Interest of Kelley*, 262 N.W.2d 781.

Michael appealed.

II. I am in complete agreement with the view that vigorous efforts should be made to compel parents to support their children. The whole legal apparatus for compelling support has been too lax. In the process of increasing our diligence, however, we should not swing the pendulum too far to the other extreme and unduly undermine parent-child relationships. A typical factual context in which to consider termination on the basis of nonsupport is illustrated by the decision cited by the trial court, *In re Kelley*, 262 N.W.2d 781 (Iowa 1978). The circumstances there were far more aggravated than here. We quoted the trial court as concluding:

"That the state has shown by clear and convincing evidence that the parents of said child have substantially, continuously and repeatedly refused or neglected to comply with the duties imposed upon them by such parent-child relationship; that the mother of the child is palpably unfit to continue in her parent-child relationship due to her consistent pattern of specific conduct detrimental to the physical and mental health of the child; that the parents, as directed by the court, have failed to correct the conditions which brought about the adjudication of neglect in December of 1974, that all efforts by the Linn County Department of Social Services have failed to remedy those conditions; that, further, the natural father, Michael Kelley, has abandoned the child and failed to pay support as ordered so as to meet substantially the requirement of his intent to permanently abandon the child."

*Id.* at 784.

I think that the present case is a proper one for severe contempt strictures—which have never been sought—but that it falls considerably short of clear and convincing proof of aggravating circumstances which are essential to warrant the drastic step of terminating the relationship altogether on account of nonsupport without good cause. Michael should have paid the child support, but total termination, under the circumstances here, seems too harsh. I would thus reverse the judgment.