# IN THE COURT OF APPEALS OF IOWA

No. 22-1371
Filed February 8, 2023

**IN THE INTEREST OF A.A.,**
**Minor Child,**

**A.C., Father,**
    Petitioner-Appellant,

**C.A., Mother,**
    Respondent-Appellee.
_____

    Appeal from the Iowa District Court for Washington County, Daniel Kitchen, District Associate Judge.


    The father of A.A. appeals from an order denying his petition to terminate the parental rights of A.A.'s mother. **AFFIRMED.**


    Sara Strain Linder of Bray & Klockau, P.L.C., Iowa City, for appellant father.

    Daniel M. Northfield, Urbandale, for appellee mother.

    Katie E. Lujan of Washington Law Office, LLP, Washington, attorney and guardian ad litem for minor child.


    Considered by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**CHICCHELLY, Judge.**

The father of A.A. appeals the juvenile court's denial of his petition to terminate the parental rights of A.A.'s mother under Iowa Code chapter 600A (2022). He claims there is clear and convincing evidence of statutory abandonment and termination is in the child's best interests. Finding neither of the asserted grounds for abandonment satisfied, we affirm the denial of his petition.

## I. Background Facts and Proceedings.

A.A. was born in 2011. His parents' relationship ended in approximately 2014. He is the only child they share, although the mother has an older child from a prior relationship. In November 2016, the court entered a decree establishing paternity, granting the parties joint legal custody, granting the father (A.C.) physical care subject to visitation with the mother (C.A.), and ordering the mother to pay $104 in monthly child support. She paid six-months' worth of child support between 2016 and 2017. She did not make any further payments until March 2022, when she paid one years' worth of support. She also paid two months' worth of support on the day of the hearing, after which she still owed over $4000.

At the time the custody decree was entered, the mother resided in Austin, Texas. Given the distance between the parties, the decree affords visitation to the mother in the form of six uninterrupted weeks during the summer, as well as alternating holiday time during spring break, Thanksgiving, and Christmas. The decree also stipulates that the mother can have reasonable visitation on weeknights and weekends when she is in the vicinity of where the child is living and provides two weeks of advanced notice. Finally, the decree specifies that

each parent may have reasonable phone contact when the child is with the other parent, which is to mean at least one phone or video call of ten minutes or more per week.

The mother moved to Denver, Colorado in early 2017 and gave birth to another child that year. In Colorado, she was self-employed less than full time. Variously, she ran a CBD apothecary, worked on a hemp farm, and worked as a belly dance instructor and performer. She also worked full-time for the summer of 2019 as a dance choreographer for kids' camps in Colorado. She testified that her income in 2018 and 2019 was in the $10–17,000 range and that she was consistently behind on rent and receiving warnings about legal actions and possible eviction. She was also without a vehicle after her then-boyfriend's car was repossessed in 2018. In 2020, matters worsened with the COVID-19 pandemic. She became sick with the virus in March and coughed so hard as to damage her rib cartilage and cause ribs to continue slipping out of place. She was in significant pain for eight months and unable to work given the pandemic closures and her physical state. She was eventually evicted after the moratorium was lifted.

By June 2021, the mother moved in with her parents in Iowa, where she continues to reside near Des Moines. She indicated a willingness and desire to take on a greater role in A.A.'s life now that she lives closer and can borrow her parents' vehicle. Since August 2021, she has been working as a freelance grant writer and part-time executive assistant, enabling her to make the recent support payments.

As for the mother's contact with A.A. while she resided out of state, the father presented a log at trial purporting to list all of her visitations and video calls

with the child since 2015. The mother's video calls rarely rose to the frequency of once per week. However, the mother pointed out that the log did not include all other communications, such as texts and emails. She also consistently sent birthday and Christmas presents, as well as other small gifts and cards. The log generally reflects regular visitation between mother and child consistent with the custody decree until 2019, when the mother missed her allotted summer visitation. No explanation was given by either party in this regard. Contact was limited to video calling during 2020 and early 2021 but increased again later in 2021 after the mother moved back to Iowa. In December 2021, the mother texted the father that she wanted visitation with A.A. one weekend per month. She also testified to this point as follows:

> Both in that September visit and at the Christmas visit when I saw [the father], I asked about having [A.A.] at least one weekend a month and was hoping to work with him on getting more time with [A.A.] because I'm local, because I have a car, because I can, and because I would really love to see my son more.

She explained that the father's response to this request was negative. In March 2022, A.A. spent several days with his mother for spring break. They had arranged for visitation again at Easter but postponed because A.A. wanted to be close to his father when he was unexpectedly hospitalized.

A.A.'s father resides in Riverside, Iowa, where he is self-employed, works from home, and homeschools A.A. He married J.P. in June 2020, but she currently resides in Iowa City due to her job. The pair report to be pursuing a joint housing arrangement. J.P. has two children from a prior relationship. Typically, A.A. and his father go to Iowa City on Thursdays to stay with J.P. and attend extracurricular

activities, and J.P. stays with them on the weekends while her children are with their father.

In January 2022, the father filed a petition to terminate the mother's parental rights with the intent that J.P. would adopt A.A. if successful. A.A. was not present at the termination hearing, but his guardian ad litem (GAL) testified as to his position. She shared that A.A. indicated a desire to have his mother's rights terminated but also did not seem to fully understand the meaning of this action. The GAL filed a report after the hearing with her recommendation to not terminate the mother's rights. The court ultimately entered an order denying the father's petition in April. The father filed a timely appeal.

## II. Review.

We review private termination proceedings de novo. *See In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). "Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *Id.* (citation omitted). When interpreting chapter 600A, the best interest of the child involved is "the paramount consideration," but we also give "due consideration" to the interests of the child's parents. Iowa Code § 600A .1(1).

## III. Discussion.

C.A. argues termination is appropriate pursuant to Iowa Code section 600A.8(4), which authorizes termination when "[a] parent has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause." "A substantial, and not merely sporadic or insignificant, failure to pay ordered support without good cause justifies termination of parental rights under section 600A.8(4)." *Klobnock v. Abbott*, 303

N.W.2d 149, 152 (Iowa 1981). While we agree the mother's failure to pay has been substantial, "[t]he burden is on the petitioner to show the parent had the ability to pay child support." *In re R.K.B.*, 572 N.W.2d 600, 601–02 (Iowa 1998).

> We described the meaning of "without good cause" in *In re B.L.A.*, 357 N.W.2d 20, 21–22 (Iowa 1984). We indicated "the key factual issue . . . concerns the [parent's] ability to pay the ordered child support." *In re B.L.A.*, 357 N.W.2d at 22. Although it is not necessary for the petitioner to show that the parent was willful in failing to pay, the parent's intent is clearly tied to an ability to pay. *Id.*; *see Klobnock v. Abbott*, 303 N.W.2d 149, 152 (Iowa 1981) ("[T]he legislature intended termination for nonsupport to occur where a parent's failure to pay manifests indifference to a child and is therefore akin to abandonment.").

*R.K.B.*, 572 N.W.2d at 602.

Here, the juvenile court found that "[the mother's] financial support for [A.A.] has not been ideal, but that support is related to her choices leading to her general financial position, not a willful failure to pay." *See B.L.A.*, 357 N.W.2d at 22 (finding the father "deliberately set out to avoid his support obligation"). When asked at the hearing whether the mother had good cause for failing to contribute to the child's support, the father responded: "I do not know that she has good cause for not doing so." In fact, the father previously told the mother that A.A.'s wants and needs were taken care of and texted "don't worry about it" when she acknowledged being behind on child support in 2020. This was not a case where the mother passively let the child rely on public benefits or actively opted not to pay out of animus toward the other parent. *See In re Kelley*, 262 N.W.2d 781, 785 (Iowa 1978) ("[The father's] antipathy for [the mother] and his willingness to let the public pay for [the child's] support do not constitute good cause for his failure to pay any part of the ordered support.").

Moreover, the father did not argue that the mother had an ability to make more money. Nothing was offered regarding her education or prior employment history. He reasoned that her failure to try to modify the support obligation demonstrates she was able to pay it. However, the mother testified to her difficult financial state, birth of another child, physical injuries, and pandemic setbacks, as well as her ability to pay going forward. On this record, the father has not established a failure to pay without good cause by clear and convincing evidence.

The father also argues the mother's parental rights should be terminated for abandonment pursuant to Iowa Code section 600A.8(3)(b). "To abandon a minor child" means to "reject[] the duties imposed by the parent-child relationship, . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(20).

> To terminate parental rights for abandonment under section 600A.8(3)(b), the petitioning party must show the child is at least six months old at the time of the termination hearing and the parent for whom termination is sought has failed to maintain "substantial and continuous or repeated contact with the child."

*In re G.A.*, 826 N.W.2d 125, 129 (Iowa Ct. App. 2012). "Substantial and continuous or repeated contact" is demonstrated by at least one of the following:

> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

*Id.* § 600A.8(3)(b)(1)–(3). To prevent a finding of abandonment, a parent must also provide "contribution toward support of the child of a reasonable amount, according to the parent's means." *Id.* § 600A.8(3)(b). A parent's subjective intent is immaterial and does not preclude a finding of abandonment. *See id.* § 600A.8(3)(c).

The juvenile court found the evidence did not support finding that the mother abandoned the child because

> she routinely contacted [the father] and [A.A.], even during the dark times of the pandemic when the community medical emergency and her own financial insecurity made more regular visits inadvisable, difficult, or inconvenient. While her contact was less than would have been ideal, there was contact between mother, [father] and [A.A.] commensurate with [the mother's] situation.

The father argues the mother failed to make a contribution of support in a reasonable amount, failed to visit the child regularly, and failed to communicate regularly with the child or himself. Similar to our conclusion above, we find that the father failed to establish the mother's failure to contribute according to her means. While the mother did not visit the child monthly, the record reflects that she was not always "physically and financially able to do so" given her physical and financial challenges in recent years. As for regular communication, A.A. and his mother exchanged video calls, texts, and emails on an infrequent basis. There was some doubt cast as to how comprehensive the record was when it came to her communications with the child and his father. The juvenile court also observed that the father was vague in hinting at disapproval of the mother's lifestyle, financial instability, and choice of relationships. The mother testified that her partner in Colorado struggled with "some mental health and addiction" but that she eventually

got him out of her life after moving back to Iowa. Like the juvenile court concluded, these scant details do not tell us "what, if any, behavior by [the mother] may have been harmful to [A.A.] during that time." We certainly agree the mother's level of parenting has been less than ideal. However, on this record, we decline to find the father has met his burden under section 600A.8(3)(b) by clear and convincing evidence.

Because we agree with the juvenile court that the father failed to establish the mother abandoned the child, we affirm the order denying his termination petition without reaching the question of the child's best interests. *See In re Q.G.*, 911 N.W.2d 761, 770 (Iowa 2018) (stating that proceedings under Iowa Code chapter 600A are a two-step process in which the petitioner must first show the ground for termination by clear and convincing evidence before the court considers the child's best interests).

**AFFIRMED.**