# IN THE COURT OF APPEALS OF IOWA

No. 17-1802
Filed June 6, 2018

**IN THE INTEREST OF H.N.M.,**
**Minor Child,**

**R.L., Mother,**
    Petitioner-Appellant,

**M.M., Father,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Wright County, Paul B. Ahlers,

District Associate Judge.

A mother appeals from the juvenile court order denying her petition to

terminate the father's parental rights to their child under Iowa Code chapter 600A

(2017). **AFFIRMED.**

Dani L. Eisentrager of Eisentrager Law, Eagle Grove, for appellant.

Douglas E. Cook of Cook Law Office, Jewell, for appellee.

Lynn C. Seaba of Malloy Law Firm, Goldfield, guardian ad litem for minor

child.

Heard by Vaitheswaran, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

A mother appeals from the juvenile court order denying her petition to terminate the father's parental rights to their daughter under Iowa Code chapter 600A (2017). She argues there is clear and convincing evidence establishing the grounds for terminating the father's parental rights under section 600A.8(3)(b) (providing for termination of parental rights where the parent has abandoned the child) and 600A.8(4) (allowing for termination of parental rights where a parent has been ordered to contribute to the support of the child and has failed to do so without good cause). She also argues termination is in the child's best interests. Taking the lead from our supreme court's recently filed opinion, *In re Q.G.*, ___ N.W.2d ___, 2018 WL 2071823 (Iowa 2018), we conclude the mother has not proved by a clear and convincing preponderance of the evidence that the father's parental rights should be terminated, and we therefore affirm the juvenile court's denial of the mother's petition.

**I. Background Facts and Proceedings.**

The child at issue was born in California in 2006. The record indicates the mother and father initially cooperated with regard to raising their daughter. The father was actively involved in his daughter's life until late 2007 when the mother began a relationship with the man to whom she is now married. After the new relationship began, the mother's cooperation with the father ended.

In 2009, in violation of a court order, the mother moved to Iowa without notifying the father or obtaining a court order approving the out-of-state move. The mother enrolled the child in school under the last name of the man to whom she is now married rather than the father's last name, and told the child that her now-

husband is the child's father. She took steps to hinder the father's relationship with the child. For example, she changed her phone number without notifying the father of her new phone number.

When the father refused to voluntarily terminate his parental rights, the mother petitioned the court to terminate the father's rights under chapter 600A, alleging the father had abandoned the child and failed to provide the child support. The juvenile court denied the petition, finding the father's lack of contact with the child was "primarily, if not exclusively, the result of the conduct of the mother." Although the court acknowledged the father was "substantially behind in his child support obligation," it determined that the father had contributed to the child's support within his means. The mother appealed the denial of her termination petition, and this court affirmed. *See In re H.N.M.*, No. 13-0897, 2014 WL 69870, at *1 (Iowa Ct. App. Jan. 9, 2014).

The mother filed the current termination action in May 2017. She again alleged the father had abandoned the child and failed to provide support for the child. Following a hearing, the juvenile court denied the petition, finding the mother had resumed efforts to prevent the father from having a relationship with his daughter immediately following the 2013 termination action. With regard to the mother's claim that the father had failed to provide support for the child, the court found "that no convincing evidence was presented that establishes that the father has not paid within his means." The court also concluded the mother failed to prove that it is in the best interest of the child to terminate the father's parental rights.

The mother appeals.

**II. Scope and Standard of Review.**

We review termination proceedings under chapter 600A de novo. *See In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). As in all termination proceedings, our primary concern is the child's best interests. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601. Though the juvenile court's fact findings are not binding, we give them weight. *See R.K.B.*, 572 N.W.2d at 601. This is especially true with regard to credibility findings. *See id.* As our supreme court has explained:

> There is good reason for us to pay very close attention to the trial court's assessment of the credibility of witnesses. A trial court . . . "is greatly helped in making a wise decision about the parties by listening to them and watching them in person." In contrast, appellate courts must rely on the printed record in evaluating the evidence. We are denied the impression created by the demeanor of each and every witness as the testimony is presented.

*In re Marriage of Vrban*, 359 N.W.2d 420, 423 (Iowa 1984) (citation omitted). A witness's facial expressions, vocal intonation, eye movement, gestures, posture, body language, and courtroom conduct, both on and off the stand, are not reflected in the transcript. Hidden attitudes, feelings, and opinions may be detected from this "nonverbal leakage." Thomas Sannito & Peter J. McGovern, *Courtroom Psychology for Trial Lawyers* 1 (1985). Thus, the trial judge is in the best position to assess witnesses' interest in the trial, their motive, candor, bias, and prejudice. We keep these principles in mind, noting the juvenile court made thorough and detailed credibility findings concerning the mother, which we discuss in greater detail below. We are cognizant of the fact that the court had no similar opportunity to size up the father as he testified via telephone.

**III. Discussion.**

In a private termination-of-parental-rights proceeding, the petitioner must establish by clear and convincing evidence that a statutory ground for termination exists. *See* Iowa Code § 600A.8; *In re A.H.B.*, 791 N.W.2d 687, 690 (Iowa 2010). If a ground is proved, the petitioner must also establish termination of parental rights is in the child's best interests. *See A.H.B.*, 791 N.W.2d at 690.

The mother petitioned to terminate the father's parental rights under two of the grounds set forth in section 600A.8. We address each in turn.

**A. Abandonment.**

Chapter 600A authorizes the court to terminate parental rights on abandonment grounds. *See* Iowa Code § 600A.8(3). Section 600A.2(19) defines abandonment of a minor child as "reject[ing] the duties imposed by the parent-child relationship . . . , which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Under section 600A.8(3)(b), a parent is deemed to have abandoned a child six months of age or older unless the parent maintains substantial and continuous or repeated contact with the child as demonstrated by contribution toward support of the child of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

> (1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.
> (2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.
> (3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of

parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

The juvenile court found the mother and her husband impeded the father's relationship with the child. In doing so, the court cited specific examples of how their actions prevented the father from contacting his daughter, noted the evidence in support of its finding as well as any conflicting evidence, and made specific and detailed credibility findings to resolve the conflict. For instance, the court noted that the mother refused the father's request to see his daughter following the 2013 termination hearing and, along with her husband, chased the father off "in an angry fashion" and followed him as he left the courthouse. With regard to conflicting testimony on the matter, the court observed:

> While the mother and [her husband] deny these allegations, the court believes the father regarding this episode over the denials of the mother and [her husband]. Besides the fact that the actions of the mother and [her husband] described by the father are consistent with the mother's and [her husband]'s ongoing attitude and efforts to exclude the father from the child's life, the court, as it did in its findings in the prior case, continues to find the mother and [her husband] generally lacking in credibility. Both the mother and [her husband] exhibited a demeanor and pervasive air about them that detracted from their credibility. In particular, the mother tended to take on an air of hostility at various times during her testimony even in response to fairly innocuous questions and, at other times, would become fairly evasive. When confronted with inconsistencies in her testimony or when topics that were not favorable to her were addressed, she would feign confusion or claim not to recall certain facts. For example, at one point, the mother denied enrolling the child in school under the last name of [her husband] rather than under [the child's] legal name . . . . She was then confronted with the findings set forth in Exhibit 1, which were based on the mother's testimony in the prior proceeding in which she acknowledged that the child was enrolled under the last name of [her husband]. At that point, the mother claimed to have forgotten that detail. The court finds it unlikely that the mother had forgotten that detail and, instead, was simply being untruthful. Suffice it to say that, based on the mother's general demeanor, air, and attitude in the manner in which she testified, the court has a fair amount of skepticism as to the

accuracy or truthfulness of much of the mother's testimony that cannot be verified by independent sources.

Although it found the father had "made limited effort to communicate with the child," the court determined this to be a result of the mother's continual refusal to allow him contact with his daughter. On this point, the court theorized,

> This is a case of learned helplessness. After being refused every request for contact with the child, it would not take long for the father to simply give up and stop asking. The fact that the father gave up because of the mother's unrelenting refusals does not reflect poorly on the father. Instead, it reflects poorly on the mother and leads to the court's conclusion that the father has not abandoned the child, as he has been prevented from visiting or communicating with the child by the mother. It would make no sense to require the father to repeatedly keep requesting visits or communication that he knows are going to be denied. There is not one event that has occurred that would have led to the father to believe that there was any hope that the mother's position would change.

In support of its finding, the court cited the mother's own testimony, finding it to be "the most damning piece of evidence in this case":

> Upon cross-examination, the mother admitted that she has refused every effort the father has made to see the child since 2013. The mother also admitted that if the father had called four times a week for the last four years, she would have never let the father talk to the child. The mother also acknowledged that there was not any circumstance under which she would have allowed the father to even talk to the child from 2013 until the present without a court order. Given this testimony, the court is hard-pressed to think of a scenario that better exemplifies the provisions of Iowa Code section 600A.8(3)(b)(1) through (3) that negates a finding of abandonment when the person having custody of the child prevents visitation or communication. That is exactly what the mother has done. Most disturbing of all was the unabashed pride the mother took in acknowledging that she has refused and would continue to refuse all requests for visits or communication between the father and the child. In response to that questioning, the mother, in contrast to her usual demeanor and manner of testifying in which she was fairly meek and somewhat evasive, sat up in her chair, practically puffed out her chest, stuck her chin out, and very clearly and proudly declared that the father has never been allowed to see or talk to the child since 2013 and never would be without a court order. This was

one of the few pieces of testimony from the mother that the court unquestionably believed.

Despite having been put on notice of the accusations of abandonment and lack of financial support in the previous 2013 proceedings, evidence in the current proceeding of the father's response to these issues since that time is nonspecific and skimpy, at best. Asked about his efforts to contact his daughter after the 2013 termination hearing, the father replied,

> I called multiple times throughout the week. I wrote—I have written letters to her, sent pictures, you know, of both [the child] and I together so she can have an understanding of who I am and, you know, just try to build a relationship. And, you know, some of the gifts basically that have been sent to her I, you know, put financial means into, so helped purchase those. So yeah, I definitely tried to contact her.

He stated, further, "Since 2013, it's been, you know, a little bit spotty, to be honest, but I have called from '13 all the way until today and sent letters. I haven't, you know—I wish it was a better job, but I don't receive any response whatsoever." Since 2013, he sent to the mother, "At least four or five letters, a handful of pictures, a card, and kind of a whole lot of phone calls." He said he kept copies of the mailings but did not submit any as evidence. He also provided no telephone records.

On the abandonment issue, the juvenile court concluded:

> The mother has failed to prove abandonment. The father has attempted to maintain a substantial and continuous or repeated contact with the child. He has also contributed to her support according to his means, which will be addressed in more detail later. It is true that the father has not visited the child at least monthly or had regular communication with the child or with the person having the care or custody of the child and has not openly lived with the child for a period of six months within the one-year period immediately preceding the termination hearing. However, this is primarily, if not exclusively, the result of the conduct of the mother. As previously

noted, the mother will allow no contact or communication between the father and the child. The mother acknowledged that there is no circumstance over the past four years under which she would allow the father to so much as speak to the child. In the face of the mother's systematic efforts to block all communication, it is difficult to the point of impossible for the father to have maintained the contact referenced in Iowa Code section 600A.8(3)(b). It defies logic, common sense, and fairness to allow the mother to engage in the conduct engaged in in this case to systematically exclude the father from the child's life and then claim abandonment. Under these facts and circumstances, the mother has failed to meet her burden to prove abandonment by the father by clear and convincing evidence.

### B. Failure to contribute to support of the child.

The court may terminate a parent's rights under section 600A.8(4) if the parent "has been ordered to contribute to the support of the child or financially aid in the child's birth and has failed to do so without good cause."

> A parent has a basic obligation to support a minor child. The legislature has determined that it is in the best interest of the child to terminate a parent-child relationship if the parent refuses to support the child. Although abandonment is a separate ground for termination, we conclude that the legislature intended termination for nonsupport to occur where a parent's failure to pay manifests indifference to a child and is therefore akin to abandonment. "[A]bnegation of court-ordered financial responsibility to a child [is] the equivalent of abandonment. A parent who unjustifiably refuses to meet a support obligation manifests complete indifference to his child."

*Knoblock v. Abbott*, 303 N.W.2d 149, 152 (Iowa 1981) (alterations in original) (citations omitted). The failure to pay must be substantial, not merely sporadic or insignificant. *See id.*

If there has been a showing of a substantial failure to pay, the court must then consider whether that failure was without good cause. *See In re B.L.A.*, 357 N.W.2d 20, 21 (Iowa 1984). In considering whether there is good cause for failure to pay child support, the key factual issue is the parent's ability to pay. *See id.* at

22. A "parent's intent is clearly tied to an ability to pay." *In re D.E.E.*, 472 N.W.2d 628, 630 (Iowa Ct. App. 1991). The burden is on the party seeking termination to show the respondent had the ability to pay child support. *See R.K.B.*, 572 N.W.2d at 601-02.

The mother has shown the father was behind in paying the child support ordered by the court. However, as the juvenile court noted,

> While it is easy to direct criticism at the father due to his spotty work history and failure to be a consistent breadwinner, the fact of the matter is that the father is and always has been a person of limited means. This is not a situation where he had a consistent job and has now drifted from job to job in an effort to avoid child support. A spotty work history has been the father's pattern throughout his adult life and is reflective of his limited educational background and circumstances. To put it another way, the mother chose to have a child with the father, who was not a real "go-getter" when that decision was made. The fact that the father continues to not be a go-getter should not come as a surprise and does not result in a conclusion that the father has not contributed to support within his means. While the court is not condoning the father being behind on his child support, the fact remains that no convincing evidence was presented that establishes that the father has not paid within his means.

The juvenile court went on to conclude:

> It is true, and undisputed, that the father is substantially behind in his child support obligation. However, the evidence presented shows that the father has contributed within his means. When a child support order was put in place in 2008, the child support was set based on the father's job as a seasonal construction worker. At approximately the same time the child support was set in 2008, an economic downturn occurred and the father lost the construction job and was on unemployment. As noted in the ruling in the prior case, since that time, the father's job history has been fairly spotty, some of which may be his fault, some of which may not. He has been laid off a number of times and has worked for a company that went out of business. He has changed residences several times, usually living with various relatives, in an effort to keep housing. However, when he has had steady employment, he has not resisted the efforts to have child support taken from his paychecks. It is not an uncommon occurrence for a father who is

actually trying to avoid his child support obligation to work for cash or to quit a job as soon as a wage garnishment or assignment is put in place. *See, e.g., In Interest of B.L.A.*, 357 N.W.2d 20, 22-23 (Iowa 1984) (terminating a father's rights when the father intentionally quit a job and never made payments except when threatened with incarceration). The father has not done that in this case. The mother presented no evidence establishing that the arrearage in child support was without good cause and presented no evidence rebutting the father's claim that he has paid within his means. She presented no evidence of the father's income that would support a finding that the father has failed to pay support without good cause. In fact, the evidence supports a finding that the father has paid within his means, even though falling short of his court-ordered obligation. Under these circumstances, the mother has failed to meet her burden of proving lack of payment without good cause by clear and convincing evidence.

## C. Best Interests.

After all of the above having been said, we need not decide if the mother proved by clear and convincing evidence either of the two statutory grounds at issue for private termination—abandonment or lack of financial support. For even assuming she did meet one of the threshold requirements for private termination, we conclude the mother did not show by clear and convincing evidence the best interests of the child will be advanced by termination of the father's parental rights.

> Iowa Code section 600A.1 provides a lengthy description regarding application of the concept of "best interest of the child" in termination proceedings. The provision states the best interest of the child "shall be the paramount consideration" in interpreting the chapter. [Iowa Code] § 600A.1. Yet, the section further provides the interests of the parents of the child "shall be given due consideration." *Id.*
> The best interest of the child requires each parent "affirmatively assume the duties encompassed by the role of being a parent." *Id.* Among other things, the court is directed to consider "the fulfillment of financial obligations, demonstration of continued interest in the child, demonstration of a genuine effort to maintain communication with the child, and demonstration of the establishment and maintenance of a place of importance in the child's life." *Id.*
> In addition to applying the language of Iowa Code section 600A.1, we have also borrowed from Iowa Code section 232.116(2)

and (3) to flesh out the best-interest-of-the-child test. *In re A.H.B.*, 791 N.W.2d 687, 690–91 (Iowa 2010). We consider the child's "physical, mental, and emotional condition and needs" and the "closeness of the parent-child relationship." Iowa Code § 232.116(2)-(3).

*Q.G.*, 2018 WL 2071823, at *9-10.

Our supreme court recently faced the question of whether the rights of a parent should be terminated in a private action filed by the other parent. *Id.* at *1. There, a mother filed a private action under Iowa Code chapter 600A seeking to terminate the parental rights of the father. *Id.* The juvenile court entered an order terminating the parental rights of the father to his young children. *Id.* This court affirmed the judgment of the juvenile court. *See id.*; *In re Q.G.*, No.16-2152, 2017 WL 3283360, at *6 (Iowa Ct. App. May 4, 2017). The supreme court vacated our decision and reversed the judgment of the juvenile court. *Q.G.*, 2018 WL 2071823, at *1. Although the mother had met the threshold requirement for termination, the court concluded the mother did not show by clear and convincing evidence the best interest of the children would be advanced by termination of the father's parental rights. *Id.* at *9, *12.

The court noted numerous factors pointing toward termination. In an understatement, the court acknowledged the father's "past conduct gives one pause." *Id.* at *10-11. The father had "a history of depression and suicidal ideation as a youth, two OWI convictions, and experimentation with meth at the age of twenty-four." *Id.* at *10. During his three-year period of drug addiction, he was incapable of providing parenting to his children and

> he possessed powerful weapons including a fully automatic AK-47 assault rifle and was working on assembling unlawful silencers. Ultimately, he pled guilty to four state criminal charges including two

counts of domestic assault involving strangulation of his spouse, one count of child endangerment, and one count of possession of methamphetamines. [The father] also pled guilty to federal weapons charges.

*Id.* The father did not take full responsibility for his actions and blamed others. *Id.* He had "troubling" issues with anger and thoughts of revenge. *Id.* at *11. He had no meaningful bond with one child and the other child only had "some" memory of his father. *Id.* After his arrest and incarceration, the father had little to no contact with the children. *Id.* The children's stepfather was willing to adopt the children. *Id.*

On the other side of the ledger, the court pointed out a few aspects of the record that supported the father's position resisting termination. *Id.* at *12. The father had a good prison record. *Id.* The father was active in department of corrections drug treatment programs and had perfect attendance at Narcotics Anonymous sessions for 180 days. *Id.* Upon release from prison he will be subject to parole supervision, including periodic drug testing. *Id.* He has extended family willing to provide additional support for parenting activities. *Id.* Upon release from prison, the father plans on living with his parents, and has a construction job lined up. *Id.*

With the above facts in mind, the supreme court concluded the father's young children, ages seven and five, "may benefit from years of exposure to their father upon his release from prison." *Id.* Based on the totality of circumstances, the supreme court was "not ready to write off [the father]'s potential positive contributions to his sons' lives." *Id.* at *13.

Here, the factors pointing to termination are de minimis compared to those set out in *Q.G.* There has been a lack of contact between the father and his daughter, and, naturally, there is a resultant lack of bond between the father and the child. Although the father was not as aggressive in seeking visitation or attempting to communicate with his daughter as one might expect, responsibility for this situation does not fall entirely on the father's shoulders as the mother did her best to thwart any visits or communication between the father and his daughter. Like in *Q.G.*, the child's stepfather here is willing to provide for the child's needs and is willing to adopt the child.

On the other side of the ledger, there are numerous factors supporting the father's position resisting termination. The father is employed, albeit not consistently. In referring to the stepfather as the child's "dad," the father recognizes the important role the stepfather has played and will play in the child's life. Nevertheless, the father wants also to be a part of the child's life. The record bears this out. As the juvenile court observed:

> Under these circumstances, one would expect the father to welcome the efforts to terminate his parental rights since he is blocked from any relationship with the child anyway and is left with an ongoing child support obligation that would be removed if his parental rights were terminated. In spite of the benefits to the father that would come from having his parental rights terminated, the father has been consistent in his efforts to fight that outcome.

The child involved is relatively young, now eleven years old.

Taking the lead from *Q.G.*, we quote with slight modification:

> On balance, we conclude [the mother] did not show by clear and convincing evidence the best interests of the [child] will be advanced by termination of [the father]'s parental rights. Families come in all shapes and sizes, and the prospect of [the father] having parental rights should not undermine the home that [the mother] and

> [the stepfather] have provided the child. It is clear [the father] . . . strongly desires to continue as [his daughter's] father. Although contact has been quite limited during the past few years . . . , the [child] remain[s] young and may benefit from years of exposure to [her father] . . . .

*See id.* at \*12. Under the totality of circumstances, we, like the court in *Q.G.*, are not ready to write off the father's potential positive contributions to his daughter's life. We therefore conclude that the mother has not proved by a clear and convincing preponderance of the evidence that the father's parental rights should be terminated.

### IV. Conclusion.

For all the above reasons, we affirm the juvenile court's order denying the mother's petition to terminate the father's parental rights.

**AFFIRMED.**